**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　Plaintiff,<br><br>vs.<br><br>NICHOLAS DAVID WELTER,<br>　　　　　　　Defendant. | Case No. 25-cr-1001-CJW<br><br>**REPORT AND RECOMMENDATION<br>ON DEFENDANT'S MOTION TO<br>SUPPRESS** |

————————————

**TABLE OF CONTENTS**

Page

I.　　INTRODUCTION.................................................................2

II.　　FINDINGS OF FACT...........................................................3

　　A.　Investigator Leitzen's Confidential Informant ...............................4

　　B.　Investigator Grant's Confidential Source .....................................5

　　C.　Arrest of Defendant .......................................................8

III.　DISCUSSION.................................................................12

　　A.　The Parties' Arguments ...................................................12

　　B.　Relevant Law ............................................................14

　　C.　Analysis.................................................................23

　　　　1.　Reasonable Suspicion for the Stop.....................................23

　　　　2.　Consent to the Seizure of the Firearm................................28

1

        **3.**     ***Further Miranda Issues*** ...................................................**34**

        **4.**     ***Inevitable Discovery*** ...................................................**35**

**IV.**     **CONCLUSION** ..................................................................**37**

## I.     INTRODUCTION

On January 15, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8). (Doc. 3.)

The matter before me is Defendant's motion to suppress. (Doc. 23.) The motion contained an inventory of one item to be suppressed, a Glock 20 10mm handgun. (Doc. 23-1.) At the hearing, Defendant moved without objection to also seek suppression of statements made by Defendant immediately after he was seized by law enforcement. (Hr'g Tr. at 2.) The Government filed a timely response. (Doc. 27.) The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on March 25, 2025. (Doc. 29.)

At the hearing, the following Government exhibits were admitted without objection:

1. Text messages; and

2. Google Maps photographs.

The Government called the following witnesses: Dubuque Police Department Investigator Chad Leitzen[1], Dubuque Co. Sheriff's Office Investigator William Grant[2], and Dubuque Police Department Investigator Nick Soppe.[3]  I found the witnesses credible.

At the hearing, Defendant was given the opportunity to submit a post-hearing supplemental brief, and the Government was given the opportunity to file a reply to it. Defendant timely filed a supplemental brief.  (Doc. 32.)  The Government timely filed a resistance to Defendant's supplemental brief.  (Doc. 33.)

After the hearing, Defendant also filed Exhibit A, the body-worn camera footage of Inv. Leitzen.  The Government does not object to the admission of Defendant's Exhibit A (Doc. 33 at 1 n. 1), so I deem it admitted for the purposes of the instant motion.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II.  FINDINGS OF FACT

The investigation into Defendant's alleged possession of a firearm arose from two different unnamed informants reporting to two different members of law enforcement. While the names of these informants were not disclosed in court, neither informant is entirely anonymous.  Each informant was personally known by the law enforcement officer to whom he or she reported.  Thus, they are better described as "confidential."

---

[1] Investigator Letizen is a 2002 graduate of the Iowa Law Enforcement Academy and has been employed as an officer with the City of Dubuque since that time.  Currently he investigates drug crimes and is a member of the Dubuque Drug Task Force.

[2] Investigator Grant is a 1997 graduate of the Iowa Law Enforcement Academy and has been an investigator in the Dubuque County Sheriff's Office since 2013.

[3] Investigator Soppe is a graduate of the Iowa Law Enforcement Academy and has been employed by the City of Dubuque since 2018.  He is currently an investigator with the Dubuque Drug Task Force.

A confidential informant (CI) spoke with Investigator Letizen and a confidential source (CS) spoke with Investigator Grant.

**A.      *Investigator Leitzen's Confidential Informant***

On October 7, 2024, the CI called Inv. Letizen and told him the CI had recently been at Joe Chop's[4] house and saw Defendant with a black 9 mm handgun.  (Leitzen Hr'g Test. at 5.)  The CI did not specify the date of the interaction.  (*Id.* at 14.)   The CI told Inv. Leitzen he had seen the handgun on a table, but he did not say Defendant placed it there.  (*Id.* at 16.)  The CI knew Defendant by name, but Inv. Leitzen did not know if they were friends.  (*Id.* at 36.)

Although Mr. Chop's residence is visible on City of Dubuque traffic cameras, Inv. Leitzen did not attempt to corroborate Defendant's presence there with the camera footage.  Inv. Leitzen was not aware if Defendant left Mr. Chop's residence with the firearm.  (*Id.* at 25.)  Inv. Leitzen conceded it was possible Defendant had exchanged the firearm with Mr. Chop for drugs.  (*Id.* at 28.)  Inv. Leitzen opined such an exchange was speculation and there was no evidence to resolve this point.

Inv. Leitzen believed the CI's statement that he had seen Defendant with a gun at Mr. Chop's house "recently" meant in the last day.  In Inv. Leitzen's experience, the CI had previously reported shortly after he saw something.  (*Id.* at 30.)  Inv. Leitzen also testified that the CI called him at 8:00 a.m. which he believed was consistent with the CI observing the gun the night before.  (*Id.* at 31.)

Inv. Leitzen deemed the information credible because he has worked with the CI for several years and his information had "always panned out."  The CI's information had been the basis for 5 or 6 search warrants, the CI had conducted multiple undercover buys, and the CI's information had been corroborated on several occasions.  (*Id.* at 6.)

---

[4] "Joe Chop" is the alias of a drug user and dealer known to Inv. Leitzen.

The CI first began cooperating with law enforcement for leniency on a drug charge, and later worked for cash. In this case, the CI was not paid for the tip regarding Defendant's gun possession.[5] Inv. Leitzen was familiar with Defendant and his father because they had been implicated in multiple local burglaries, including cases involving stolen guns. Inv. Leitzen also knew Defendant to be a drug user. (*Id.* at 27.) While Inv. Leitzen knew the CI was a felon and a drug user, he had not reviewed the CI's criminal history prior to the hearing and was unable to identify specifics about it. (*Id.* at 21.)

The CI was at Mr. Chop's house on his own initiative. The CI is a felon and not supposed to be around firearms. Inv. Leitzen does not always attempt to corroborate all the information he receives from confidential informants, including this CI. (*Id.* at 41-42.) However, whenever he has attempted to corroborate information from this CI, he was able to do so. (*Id.*)

## B.     *Investigator Grant's Confidential Source*

The other strand of the investigation begins with Investigator William Grant on October 16, 2024, after 8:00 p.m. when he was off duty. Inv. Grant received a text from the CS, a personal and family acquaintance he had known for at least 40 years. The CS had previously communicated with Inv. Grant about family members or he[6] would ask about missing items to avoid buying stolen property. (Grant Hr'g Test. at 44.) The CS has never offered information that was helpful to law enforcement to Inv. Grant's knowledge. The CS had never told Inv. Grant something that turned out to be untrue.

---

[5] Inv. Leitzen was questioned at length about whether the CI expected or wanted to be paid for the tip about Defendant's possession of a firearm. To some extent, Inv. Letizen was asked to speculate regarding the CI's motive in offering assistance on this occasion. While this instance of cooperation may have gone unpaid, the transaction appears neither wholly commercial nor purely altruistic. Nevertheless, it was clearly established that the CI had an ongoing financial incentive to provide helpful information to law enforcement. Here, I conclude this circumstance does not significantly undermine the CI's reliability.

[6] Inv. Grant volunteered the CS's gender.

The CS was known by Inv. Grant to have an "extensive" and "robust" criminal history going back decades involving a "variety" of crimes. (*Id.* at 67.) Inv. Grant did not know if the CS had a history of using drugs.

The text messages are shown in Government's Exhibit 1 commencing with the following inquiry:

> Hypothetically, if I took a gun from someone cause they needed it taken then called the cops would I b charged 4 having it

(Gov. Ex. 1.) In a series of reply texts, Inv. Grant made suggestions about possible responses to the "dilemma." (*Id.*) CS then texted, "They r looking for ur Boys 2 pull them over and have it out. Suicide by cop shit." (*Id.*) Inv. Grant established the person in question was not female and was still in possession of "it." (*Id.*) After texting briefly about whether the CS could safely secure it and keep his name out of it, the CS cautioned, "If they get pulled over. Handle with care for real. I'll call in a few." (*Id.*)

At about 8:47 p.m., Inv. Grant spoke with the CS by telephone. The CS was whispering. This made Inv. Grant suspect he wanted to avoid someone hearing the conversation. The CS reported that Defendant[7] was pointing a handgun at himself and someone else. (Grant Hr'g Test. at 46.) The CS reported he was in or near Mr. Chop's house.[8] The CS described Defendant as having a red GMC truck. The CS reported the Defendant was "tweaking" which Inv. Grant inferred meant under the influence. (*Id.* at 71.) The CS did not say if he was in the car with Defendant or under what conditions he

---

[7] As explained below, the CS later identified Defendant as the person in question. For clarity and consistency, I refer to the subject of the communications between CS and Inv. Grant, even at this early stage, as "Defendant."

[8] The description was somewhat ambiguous, "he was in a location of a residence belonging to someone he called Joe Chop." (Grant Hr'g Test. at 47.) Inv. Grant testified that Mr. Chop's address on Iowa Street, a short distance from where Defendant was arrested at XXXX Bluff Street.

had seen Defendant. (*Id.* at 68.) Inv. Grant did not attempt to interview Defendant's father even though he knew his name and Defendant's father had never informed the police about any concerns regarding Defendant. (*Id.* at 71.) Later that night the CS texted Inv. Grant an alphanumeric sequence that was determined to be the license plate number of a red Chevy Colorado truck registered to Defendant's father.

On October 17, 2024, after first making inquiries regarding Mr. Chop's residence, Inv. Grant attempted to locate the red truck on City of Dubuque traffic cameras. During these efforts, Inv. Grant received a call from the CS who identified Defendant as the person in the vehicle with a handgun and that he had been pointing it at his father. The CS further reported that Defendant was a methamphetamine user, was paranoid, and worried about returning to prison. The CS described the vehicle as being heaped with junk because Defendant and his father were living in it. (*Id.* at 49.) This further detail helped Inv. Grant locate the truck with the traffic cameras near Mr. Chop's house around 10:00 p.m. on October 16, 2024. Specifically at the intersection marked on Gov. Ex. 2 at 3. Using file photographs of Defendant and his father, Inv. Grant was able to identify them in the vehicle.

At about 3:07 p.m. on October 18, 2024, Inv. Grant received another call from the CS. The CS informed Inv. Grant that the Defendant's vehicle was near Behr Funeral Home. Behr Funeral Home's proximity to XXXX Bluff Street is depicted on Gov. Ex. 2 at 1. The CS told Inv. Grant that Defendant was still in possession of a gun and was acting paranoid. Inv. Grant did not know why the CS was able to identify Defendant by name at this time. (*Id.* at 75.) The CS did not tell Inv. Grant why he believed Defendant still had a gun. (*Id.* at 76.)

While Inv. Grant attempted to locate Defendant's vehicle on traffic cameras, the CS texted him that the vehicle was still in the area. Unable to immediately confirm the vehicle's presence by traffic cameras, Inv. Grant drove to the area near Behr Funeral

7

Home.  Inv. Grant saw Defendant standing outside his vehicle on Bluff Street.  (*Id.* at 54.)  Inv. Grant did not observe any bulges on his person consistent with possession of a firearm (*id.* at 76), nor did he observe Defendant "tweaking," acting paranoid, making furtive movements, or otherwise appearing suspicious.  (*Id.* at 76-77.)   Inv. Grant was in communication with Inv. Leitzen by this time as they attempted to confirm Defendant was a felon.  Law enforcement determined Defendant was a felon before arresting him.  (*Id.* at 82.)

On cross-examination, Inv. Grant was asked about a discrepancy between his testimony about who possessed the gun and what is shown on the Dubuque County Sheriff's Office dispatch records.  On October 16, 2024, Inv. Grant called dispatch with information about the above-described investigation.  Jennifer Snider created a notation of the call that states, "Investigator Grant just called in after receiving an anonymous tip that a male subject named Joe Chop is driving around the downtown area with a handgun and was planning suicide by cop on a traffic stop."  (*Id.* at 60.)  This report was not offered into evidence.  Inv. Grant testified the note was not an accurate statement of what he told Ms. Snider.  The next day when Inv. Grant saw how the information had been entered, he advised his shift commander of the error.  (*Id.* at 61.)  Inv. Grant did not author a report to acknowledge the error, but did have the city shift commander make a correction in the city shift report and he prepared an intel bulletin that was put out by a fellow investigator.  (*Id.* at 61, 79.)

Defense counsel also pointed out a notation in the report that "caller [was] uncooperative" was not accurate.  Defense counsel further pointed out that by calling a family friend, the CS was able to avoid the 911 system.

## C.    *Arrest of Defendant*

At 3:52 p.m. on October 18, 2024, Inv. Grant received a text from the CS advising him that Defendant was in the truck because he was not welcome inside the apartment

8

because he points "that" at everyone. Inv. Grant interpreted "that" as the gun. (Grant Hr'g Test. at 55-56; Gov. Ex. 1 at 4.) Inv. Grant did not know if this was based on firsthand observation by the CS or something the CS had received remotely through others. (*Id.* at 58.) At 4:09 p.m. the CS texted Inv. Grant that Defendant was "a hundred percent spun" which Inv. Grant interpreted as not "in his right mind and possibly on drugs." (*Id.* at 56.) Once Inv. Grant had spotted Defendant, he took up a position near Mr. Chop's house to monitor the situation.

At about 4:30 p.m., Inv. Leitzen and other officers who had been surveilling Defendant executed their plan to approach Defendant at XXXX Bluff Street[9] and detain him during their investigation. (Leitzen Hr'g Test. at 12-13.) By this time, Inv. Leitzen had learned about the information gathered by Inv. Grant. Also, Inv. Leitzen had observed a red pickup truck associated with Defendant and his father parked in front of XXXX Bluff Street. Inv. Leitzen observed the passenger door of the truck open with Defendant sitting on the passenger seat and one or both legs out of the vehicle and leaning back in the vehicle. Defendant was alone in the vehicle. Inv. Leitzen was standing near the corner of the porch of the Bluff Street residence and ordered Defendant out of the vehicle and over to him. Inv. Leitzen and other officers had their weapons drawn and Defendant was ordered out "at gunpoint." (*Id.* at 34.)

Defendant complied with the order to leave the truck and approached Inv. Leitzen. As Defendant was called from the truck, Inv. Soppe walked around the passenger side of the truck and observed a gun in plain view in the vehicle. (*Id.* at 39-40.) As he was placed in handcuffs, Defendant immediately volunteered that there was a gun in the car,

---

[9] The location of the residence is shown in Gov. Ex. 2. Bluff Street is a one-way, southbound street. Defendant's truck was parked in the direction of traffic. Thus, when sitting partially in the vehicle, Defendant would have been on the seat with his foot (or feet) out the door near the sidewalk between the truck and the residence. (Leitzen Hr'g Test. at 40-41.) Inv. Leitzen could see Defendant, but he could not see into the truck. (*Id.* at 41.)

9

telling Inv. Leitzen, "There's a gun in the car. I don't want it, you guys can have it" while he was being handcuffed. Inv. Leitzen testified as follows:

> Q. Did he immediately volunteer that there was a gun in the car?
> A. Yes.
> Q. What did you do next?
> A. I placed him into handcuffs, and he continued to talk about the fact that there was a gun in the car that he was going to bring to the police department, but he was scared to because he knew he couldn't have it because he was a felon. I placed him into handcuffs and then stopped him and advised him that I was going to advise him of his *Miranda* rights, which I did do, and then I spoke to him more.
> Q. After you advised him of his *Miranda* rights, did he give law enforcement consent to take the gun?
> A. Yes. He stated he didn't want it and that we could have it.
> Q. Did he make additional incriminating statements after that?
> A. Yes.

(*Id.* at 13-14).

Inv. Leitzen's body-worn camera footage substantiates this testimony. (Def. Ex. A.) The footage shows Inv. Leitzen approach the red pickup in front of XXXX Bluff Street. When Inv. Leitzen emerged from his vehicle immediately north of XXXX Bluff Street, a K9 unit from the Dubuque Police Department was parked immediately in front of him with an officer standing in the door of the K9 unit. (Ex. A at 2:09.) Inv. Leitzen approached the northeast corner of the porch with his gun drawn and pointed at Defendant. (*Id.* at 2:16.) The passenger door of the pickup truck was open, but Defendant was seated in the vehicle. (*Id.* at 2:17.) In response to Inv. Leitzen's direction to exit the truck, Defendant emerged from the vehicle and asked, "For what?" Inv. Leitzen directed Defendant to put his hands on "the wall" which is the shoulder-high foundation of the porch approximately one foot off the sidewalk. Inv. Leitzen lowered his gun at 2:34 and no more handguns were visible thereafter. Another officer assisted placing Defendant in handcuffs as Defendant said, "I need you guys' help." (*Id.* at 2:38.)

10

Inv. Leitzen asked Defendant if he has anything illegal on him and Defendant said, "No." Inv. Leitzen started a pat down search of the pockets of Defendant's pants and then asked if it is "alright we reach into your pockets." (*Id.* at 2:44.) The exchange then proceeded as follows:

> Defendant: "Dude, I need your guys' help. I have something in the car for you guys."
> Inv. Leitzen: "What do you got?"
> Defendant: "There's a fucking gun in there. I need help."
> Inv. Leitzen: "There's a gun in there?"
> Defendant: "Yup."

Inv. Leitzen advised Defendant of his *Miranda* rights at 3:07 and the video concluded,

> Inv. Leitzen: "What do you need help with?"
> Defendant: "They're framing me for something."
> Inv. Leitzen: "Where did the gun come from?"
> Defendant: "I don't know."
> Inv. Leitzen: "Is this your truck?"
> Defendant: "No. It's my father's truck."
> Inv. Leitzen: "Can we grab that gun out of there?"
> Defendant: "Yes. Please."
> Inv. Leitzen [to other officers]: "He says you can grab the gun out of there. He wants you to have it."

At the time Defendant made these statements, nobody was pointing a gun at Defendant, shouting, or threatening Defendant. (Leitzen Hr'g Test. at 35.)

Inv. Soppe, testified regarding his involvement in Defendant's arrest. When Inv. Soppe arrived at the area near XXXX Bluff Street on October 18, 2024, he began surveilling the area to see if Defendant would attempt to drive away and give officers an opportunity to conduct a traffic stop. (Soppe Hr'g Test. at 86.) Inv. Soppe first saw Defendant sitting in front of XXXX Bluff Street, on the west side of the street, outside of a red Chevy Colorado. (*Id.* at 86-87.) Defendant then entered the passenger seat of

the vehicle and remained seated there. At no time did officers attempt a walk-by of the vehicle. (*Id.* at 91.)

After law enforcement surrounded the vehicle, Defendant was called away from the vehicle. Defendant cooperated and was detained. While Defendant was being handcuffed, Inv. Soppe looked inside and saw a black, Glock-style handgun sitting on the passenger floorboard on some clothing. (*Id.* at 87.) Inv. Soppe testified that because of the placement of the handgun and the fact it was not covered, it would have been in plain view even if Defendant had not been ordered from the vehicle. Inv. Soppe acknowledged that the vehicle was cluttered and that some members of law enforcement (although not Inv. Soppe) were aware Defendant was living in the vehicle.

According to Inv. Soppe, Defendant did not make any furtive moves. A police K-9 alerted to the presence of a controlled substance within 15 minutes of when Defendant was ordered from the vehicle. (*Id.* at 88.) The vehicle was searched, and officers located a small amount of marijuana, a marijuana pipe, the handgun, and one loose 9-millimeter round.

## III.  DISCUSSION

### A.  The Parties' Arguments

Defendant's argument refers only to an "anonymous tipster" and not a confidential informant. Based on Defendant's description of the information shared with law enforcement, Defendant's initial brief appears to be focused solely on what Inv. Grant learned from his Confidential Source.[10]  For consistency, I will refer to Defendant's "anonymous tipster" as the CS.

First, Defendant urges the Court to apply the "totality of the circumstances" test to determine if law enforcement had a lawful basis to seize Defendant and search his

---

[10] This is in no way a criticism of the defense. I have no way of knowing what information is contained in the Government's discovery file when suppression motions are due.

vehicle.   Defendant asserts that "the anonymous source's allegations against the Defendant served as the only basis to seize him." (Doc. 23-2 at 4.)  Defendant argues that the CS is less credible because the CS was anonymous.   Moreover, Defendant asserts, an anonymous tip is generally insufficient to provide reasonable suspicion for a *Terry* stop.

Defendant argues that the CS's tip lacked significant predictive information. Defendant argues that the information supplied by the CS was not meaningfully corroborated and was contradicted by traffic cameras and surveillance.  Defendant asserts that the CS's knowledge of Defendant's name does not show knowledge of any criminal conduct by Defendant.  Defendant also argues that the number of calls from the CS to law enforcement does not make them more credible because together they show, at best, one observation of the firearm and updates on Defendant's location.

Defendant contends that the factors from *Navarette v. California*, 572 U.S. 393, 399 (2014) do not support finding the tip reliable.  That is, the CS did not report eye-witness knowledge, the tip was not contemporaneous, and it was not reported using the 911 system to permit tracing.  Ultimately, Defendant argues that the tip was insufficiently reliable on its own and was not significantly corroborated to justify seizure of Defendant.

In Defendant's supplemental brief (Doc. 32), Defendant argues he did not voluntarily consent to the seizure of the firearm.  Defendant argues he suffers from memory loss as shown in the Pretrial Services Report.  (Doc. 18.)  He also argues he was under the influence at the time of the seizure, and police did not advise him of his right to withhold consent.  While Defendant concedes officers read him his rights, he asserts that he was in custody and subject to intimidation from officers who had their hands on him and pushed him against a wall.

The Government counters that, in fact, law enforcement had reasonable suspicion based on information from two known sources.  The Government contends these sources

are more reliable than anonymous tipsters and the tips were sufficiently corroborated. The Government argues the CI was reliable based on previous instances where the CI had provided law enforcement information that was corroborated, had participated in multiple controlled buys, had supplied information for five search warrants, and had never supplied untrue information. The CI also personally saw the gun, was able to describe it, and the information was supplied contemporaneously to law enforcement.

The Government also argues that reasonable suspicion was supported by the information supplied to Inv. Grant by the CS. The Government argues that the source was known and not anonymous. Moreover, the information was based on the CS's eyewitness observations and promptly provided to law enforcement, and the location of Defendant and the truck were corroborated by traffic cameras and surveillance. The Government argues the cases Defendant relies upon are distinguishable.

The Government next asserts that even if there was a Fourth Amendment violation, law enforcement would have inevitably discovered the firearm because it was in plain view and/or it would have been discovered when a search followed the K9 alert.

Regarding Defendant's consent to search, the Government argues that there is no evidence officers pointed firearms at Defendant at the time he gave consent to take the gun. The Government asserts there is little evidence of Defendant's alleged diminished capacity. The Government points to Defendant's compliance with officers' orders to show he was able to consent to the seizure of the gun.

**B.     *Relevant Law***

"The Fourth Amendment prohibits unreasonable . . . seizures by the Government, and its protections extend to brief investigatory stops of persons . . . that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *United States v. Cortez,* 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted). Officers may only conduct investigatory stops if they have

14

reasonable suspicion that "criminal activity may be afoot." *Id.* (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)); *United States v. Patrick*, 776 F.3d 951, 954 (8th Cir. 2015). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *Patrick*, 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417); *see also United States v. Brown*, 60 F.4th 1179, 1182 (8th Cir. 2023) ("In analyzing whether an officer had reasonable suspicion, [courts] look to the totality of the circumstances.") (Citing *Kansas v. Glover*, 140 S.Ct. 1183, 1191 (2020)). "Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) (quotation omitted); *see also Alabama v. White*, 496 U.S. 325, 330 (1990) ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."). "In short, the government must point to specific, articulable facts that reasonably suggest a crime." *United States v. Bustos-Torres*, 396 F.3d 935, 942 (8th Cir. 2005) (citing *Terry*, 392 U.S. at 27).

"In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Ortiz–Monroy*, 332 F.3d 525, 529 (8th Cir. 2003) (internal quotation marks and citations omitted). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Navarrete-Barron*, 192

F.3d 786, 790 (8th Cir. 1999) (citations omitted). Moreover, "[t]he 'reasonable suspicion' necessary to justify [a *Terry*] stop 'is dependent upon both the content of information possessed by the police and its degree of reliability.'" *Navarette v. California*, 527 U.S. 393, 397 (2014) (quoting *White*, 496 U.S. at 330).

"Reasonable suspicion may be based on an informant's tip where the tip is both reliable and corroborated." *United States v. Bell*, 480 F.3d 860, 863 (8th Cir. 2007) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972); *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir. 2004)); *see also United States v. Winborn*, 111 F.4th 910, 912 (8th Cir. 2024) ("A reliable witness's tip can provide reasonable suspicion to make an investigatory stop.") (Citing *Navarette*, 527 U.S. at 399-400; *United States v. Mosely*, 878 F.3d 246, 252-53 (8th Cir. 2017)). The Eighth Circuit has held that, "[t]hough less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent*, 531 F.3d 642, 648 (8th Cir. 2008). In *United States v. Nolen*, 536 F.3d 834 (8th Cir. 2008), the Eighth Circuit explained these distinctions further:

> [T]he Supreme Court has recognized a distinction between "a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated," *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), and an anonymous informant, who cannot so easily be held responsible. *See also United States v. Kent*, 531 F.3d 642, 649 (8th Cir.2008) (asserting that a known informant "could be held accountable by [a] detective for [providing] false information"). This distinction is important, because although a tip received from a known informant will more readily support a finding of probable cause, a tip received from an anonymous informant requires "[s]omething more," usually in terms of independent police corroboration, before probable cause may arise. [*Illinois v.*] *Gates*, 462 U.S. [213,] 227, 241. . . .

In addition to there being a distinction between known informants and anonymous informants, there is also an important distinction between the two types of known informants: reliable informants and unproven informants. Reliable informants are individuals who have "a track record of supplying reliable information" to law enforcement officers. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993). Information supplied by such parties may be "sufficiently reliable to support a probable cause finding." *Id*. *See also United States v. Lucca*, 377 F.3d 927, 933 (8th Cir.2004) (asserting "[t]he information from a [confidential reliable informant] is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information."). Unproven informants are individuals without a track record of supplying information to law enforcement officers. "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *Kent*, 531 F.3d at 649. Nevertheless, information supplied by such individuals "requires some independent verification to establish reliability." *Id*. (citing *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir.1995)). "Independent verification occurs when the information (or aspects of it) is corroborated by the independent observations of police officers." *Brown*, 49 F.3d at 1349.

*Nolen*, 536 F.3d at 839-40. "A[n] . . . informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability[.]" *United States v. Manes*, 603 F.3d 451, 456 (8th Cir. 2010). The following are indicators of an informant's reliability: (1) eyewitness knowledge of facts, *Navarette*, 527 U.S. at 399; (2) predictions of future behavior, *id.* at 398; *Manes,* 603 F.3d at 456; (3) detailed descriptions of alleged wrongdoing, *Navarette,* 572 U.S. at 398; (4) a track record as a reliable source of information, *Manes,* 603 F.3d at 456; (5) independent corroboration of facts, such as identity, *id.; Navarette,* 572 U.S. at 398; and (6) contemporaneous reporting of events, such as calling 911 immediately upon viewing criminal behavior, *Navarette,* 572 U.S. at 398-400 (internal citations omitted). *United States v. LaGrange*, No. 18-CR-90-CJW, 2018 WL 6198278, at *6 (N.D. Iowa Nov. 28, 2018); *see also Winborn*, 111 F.4th at 913 ("Reliability is

17

determined by evaluating an eyewitness's knowledge of the alleged incident, the contemporaneous reporting of the event, and the ability to hold the caller accountable for potentially false reports.").

In general, the reasonable suspicion standard "is 'less demanding' than probable cause and much lower than preponderance of the evidence." *United States v. Callison*, 2 F.4th 1128, 1132 (8th Cir. 2021) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). In *Alabama v. White*, 496 U.S. 325 (1990), the Supreme Court explained that:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S. at 147. . . . Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.

*White*, 496 U.S. at 330.

"There is no clear line between investigative stops and de facto arrests." *United States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016) (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)). The Eighth Circuit explained that:

> During a *Terry* stop, officers must use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *United*

States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). "A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force." *Id*. "As part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop.'" *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (quoting *Newell*, 596 F.3d at 879). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). "In discerning whether [an officer's] actions [meet] the Fourth Amendment's standard of reasonableness, the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014).

*Sanford*, 813 F.3d at 713.

"A warrantless search is valid under the Fourth Amendment if it is 'conducted pursuant to the knowing and voluntary consent of the person subject to a search.'" *United States v. Gastelum*, 11 F.4th 898, 904 (8th Cir. 2021) (quoting *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005)). "A defendant's consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, rather than a product of duress or coercion, express or implied." *United States v. Sallis*, 920 F.3d 577, 582 (8th Cir. 2019) (quotation omitted). The "'issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented.'" *Gastelum*, 11 F.4th at 904 (quoting *United States v. Magallon*, 984 F.3d 1263, 1280 (8th Cir. 2021). In other words, "'whether it was reasonable for the officer to believe that the suspect gave him permission to search the requested item.'" *Id*. (quoting *Magallon*, 984 F.3d at 1280). In evaluating whether consent is voluntary, courts consider the totality of the circumstances, including the following factors:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id*. (alteration in original) (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)).

"The familiar *Miranda* rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." *United States v. Armstrong*, 39 F.4th 1053, 1056 (8th Cir. 2022). "*Miranda* warnings are required only when a person is in custody, because they are intended to 'protect the individual against the coercive nature of custodial interrogation.'" *United States v. Soderman*, 983 F.3d 369, 376 (8th Cir. 2020) (quoting *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011), in turn quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011)). Interrogation "refers to express questioning and to words or conduct that officers should know is 'reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Briones*, 390 F.3d 610, 612 (8th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "A person is considered to be in custody for the purposes of *Miranda* warnings when there is a 'formal arrest or restraint [on his or her] freedom of movement of the degree associated with formal arrest.'" *United States v. Sandell*, 27 F. 4th 625, 628-29 (8th Cir. 2022) (quoting *United States v. Parker*, 993 F.3d 595, 601 (8th Cir. 2021)).

20

In *United States v. Pelayo-Ruelas*, 345 F.3d 589 (8th Cir. 2003), the Eighth Circuit provided a clear discussion of the interplay between the principles outlined in *Terry* and the principles outlined in *Miranda*:

> In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a law enforcement officer, prior to conducting custodial interrogation, must advise the suspect of his right to be free from compulsory self-incrimination and to the assistance of counsel. Following *Miranda*, the Supreme Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), that a police officer with reasonable suspicion that criminal activity is afoot may briefly detain a suspect to investigate the circumstances giving rise to that suspicion.
>
> In *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a traffic stop case, the Court discussed the interaction between the custodial interrogation principle of *Miranda* and the brief-detention-to-investigate principle of *Terry*:
>
>> The [*Terry*] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of *Miranda*.
>
> (Quotation and citation omitted.) Citing *Berkemer*, we have declared that, "No *Miranda* warning is necessary for persons detained for a *Terry* stop." *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir.1986), followed in *United States v. Johnson*, 64 F.3d 1120, 1125–26 (8th Cir.1995), *cert. denied*, 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996). Thus, we

reject as contrary to this controlling authority [the defendant's] broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights.

*Id*. at 591-92; *see also United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) ("[A] *Terry* stop . . . allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'") (Quoting *Berkemer*, 468 U.S. at 439).

"An individual who waives his *Miranda* rights must do so both knowingly and voluntarily." *United States v. Worthy*, 129 F.4th 479, 485 (8th Cir. 2025). In meeting these requirements:

A waiver is "knowing and intelligent" where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is "voluntary" where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception.

*United States v. Pierson*, 73 F.4th 582, 590 (8th Cir. 2023) (quoting *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2015)). "To determine whether a waiver . . . was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was overborne." *Id*. (quoting *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002)). "Circumstances to be considered include the background, experience, and conduct of the accused." *United States v. Rose*, 124 F.4th 1101, 1107 (8th Cir. 2025) (quoting *United States v. Nguyen*, 608 F.3d 368, 374 (8th Cir. 2010)); *see also United States v. Rooney*, 63 F.4th 1160, 1168 (8th Cir. 2023) ("Some of the factors we consider include: 'the degree of police coercion, the length of the interrogation, its

location, its continuity, and the defendant's maturity, education, physical condition, and mental condition.'") (Quoting *Magallon*, 984 F.3d at 1284). "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Pierson*, 73 F.4th at 590 (quoting *United States v. Williams*, 793 F.3d 957, 962 (8th Cir. 2015)); *see also United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020) ("Absent improper threats, use of physical force, or intimidation tactics, psychological pressure almost never renders a [statement] involuntary.").

Finally, "[w]here information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Sallis*, 920 F.3d 577, 582-83 (8th Cir. 2019) (alteration in original) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). Under the inevitable discovery doctrine, "'the government must prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation.'" *United States v. Smith*, 21 F.4th 510, 517 (8th Cir. 2021) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)).

**C.    Analysis**

**1.    Reasonable Suspicion for the Stop**

Defendant and the Government frame the issue of whether law enforcement had a reasonable suspicion that criminal activity was afoot differently. Defendant repeatedly refers to law enforcement's reliance on statements from a single anonymous source as the only articulable facts supporting law enforcement's suspicion of criminal activity

afoot. (Doc. 23-2 at 4-8.) As I noted above, I have no knowledge of the information contained in the Government's discovery file at the time a motion to suppress is due and my conclusion on the proper framing of the instant issue is in no way a criticism of the defense. It is clear, however, from the facts presented at the suppression hearing that law enforcement was not contacted by a single anonymous source but instead by two different individuals known to the respective officers.

Inv. Leitzen's CI had worked with him for several years and had provided information that had "always panned out." (Leitzen Hr'g Test. at 6.) The CI's information had been the basis for 5 or 6 search warrants, the CI had conducted multiple undercover buys, and the CI's information had been corroborated on several occasions. (*Id.*) On October 7, 2024, the CI told Inv. Leitzen that the CI had recently been at Joe Chop's house and saw Defendant with a black 9 mm handgun. (*Id.* at 5.) The CI knew Defendant by name and observed the handgun on a table, but did not say whether Defendant had placed it on the table. (*Id.* at 16, 32.) While the CI did not tell Inv. Leitzen the date of the interaction, Inv. Leitzen testified that he believed the CI's statement that he had seen Defendant with a gun at Mr. Chop's house "recently" meant in the last day. In Inv. Leitzen's experience with the CI, the CI reports something shortly after he sees it. (*Id.* at 14, 30.) Further, Inv. Leitzen testified that the CI called him at 8:00 a.m. which he found consistent with the CI observing the gun the night before. (*Id.* at 31.) Inv. Leitzen knew Defendant was a felon and was familiar with Defendant and his father because they had been implicated in multiple local burglaries, including cases involving stolen guns. Inv. Leitzen also knew Defendant to be a drug user. (*Id.* at 27.) Inv. Leitzen testified that he found the information provided by the CI credible and, while he did not attempt to corroborate this report, whenever he had attempted to corroborate information from this CI in the past, he was able to do so. (*Id.* at 6, 41-42.)

24

Inv. Grant's CS was known to him for at least 40 years. Previously, Inv. Grant had communicated with the CS regarding family members, or the CS would inquire about missing items to avoid buying stolen property. While the CS had not previously offered information to law enforcement, the CS had also never told Inv. Grant anything that had turned out to be untrue.

Initially, the CS inquired whether he would be charged if he took a gun from another person and called law enforcement. (Gov. Ex. 1.) The CS also indicated that the person in possession of the gun wanted to be pulled over and attempt "suicide by cop[.]" (*Id.*) Less than an hour later, the CS called Inv. Grant. This time the CS was whispering, and Inv. Grant suspected that the CS wanted to avoid someone overhearing the conversation. The CS told Inv. Grant that the same person was pointing a handgun at himself and someone else. (Grant Hr'g Test. at 46.) The CS also reported that he was in or near Mr. Chop's house and stated the person had a red GMC truck. The CS did not say if the person with the gun was in the car with Defendant or under what conditions he had seen Defendant. (*Id.* at 68.) Later that night, the CS texted Inv. Grant the license plate number of a red Chevy Colorado registered to Defendant's father.

The next day, October 17, 2024, Inv. Grant attempted to locate the vehicle on City of Dubuque traffic cameras. During these efforts, Inv. Grant received a call from the CS who reported that Defendant was the person in the vehicle with a handgun and that he had been pointing it at his father. The CS also reported that Defendant was a methamphetamine user, was paranoid, and was worried about returning to prison. Additionally, the CS described the vehicle as being heaped with junk because Defendant and his father were living in it. (*Id.* at 49.) This further detail helped Inv. Grant locate the truck with the traffic cameras near Mr. Chop's house around 10:00 p.m. on October 16, 2024. Using file photographs of Defendant and his father, Inv. Grant was able to identify them in the vehicle.

At about 3:07 p.m. on October 18, 2024, Inv. Grant received another call from the CS. The CS informed Inv. Grant that the Defendant's vehicle was near Behr Funeral Home. The CS told Inv. Grant that Defendant was still in possession of a gun and was acting paranoid. Inv. Grant did not know why the CS was able to identify Defendant by name at this time. (*Id.* at 75.) The CS did not tell Inv. Grant why he believed Defendant still had a gun. (*Id.* at 76.) Unable to immediately confirm the vehicle's presence by traffic cameras, Inv. Grant drove to the area near Behr Funeral Home. Inv. Grant saw Defendant standing by his vehicle on Bluff Street. (*Id.* at 54.) Inv. Grant did not observe any bulges on his person consistent with possession of a firearm (*id.* at 76), nor did he observe Defendant "tweaking," acting paranoid, making furtive movements, or otherwise appearing suspicious. (*Id.* at 76-77.) Law enforcement also confirmed that Defendant was a felon. (*Id.* at 82.)

Based on the totality of the circumstances, I find that the CI was a reliable informant, as the CI had "'a track record of supplying reliable information' to law enforcement officers." *Nolen*, 536 F.3d at 840 (quoting *Williams*, 10 F.3d at 593). Further, based on the totality of the circumstances, I find that although the CS was an unproven informant (i.e., less reliable than an informant with a proven record), the CS was more reliable than an anonymous tipster. *See Kent*, 531 F.3d at 649 ("Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information."). I also find that Defendant's concern about tipsters evading responsibility for misinformation by avoiding the 911 system are not present here because law enforcement knew the identity of both informants. Moreover, I find that both the CI and the CS met the following indicators of informant reliability:

(1) they both had eyewitness knowledge of Defendant possessing a handgun, *see Navarette*, 527 U.S. at 399;

26

(2) they both provided detailed descriptions of observing Defendant with the handgun at Mr. Chop's house, the CI observing the handgun on a table at Mr. Chop's house, the CS observing Defendant point the handgun at himself and at his father, the CS observing defendant point the handgun at his father in his father's red Chevy Colorado, and the CS observing Defendant and the truck near Behr Funeral Home, *see id.* at 398;

(3) the CI had a track record as a reliable source of information for Inv. Leitzen, *see Manes,* 603 F.3d at 456; and

(4) Inv. Grant corroborated the CS's information. First, by locating Defendant's truck with traffic cameras near Mr. Chop's house around 10:00 p.m. on October 16, 2024. Second, by identifying Defendant and his father inside the truck by using file photographs of Defendant and his father and on October 18, 2024. And third, by driving to the area near Behr Funeral Home and observing Defendant standing outside his vehicle on Bluff Street. *See id.*; *Navarette,* 572 U.S. at 398.

Additionally, I give some weight to the contemporaneous reporting of events, as the CS was whispering when he called Inv. Grant on October 16, 2024, and Inv. Grant observed Defendant near Behr Funeral Home after the CS reported Defendant being in that area on October 18, 2024.[11] *See Navarette*, 572 U.S. at 398-400.

Further, based on the totality of the circumstances outlined above—the information about Defendant's illegal possession of firearm and the reliability of the CI and the CS— I find that law enforcement had a reasonable and articulable suspicion that criminal activity was afoot to conduct a valid investigatory *Terry* stop on Defendant. *See United States v. Gonzalez*, 133 F.4th 819, 822 (8th Cir. 2025) ("An investigatory, or *Terry*, stop without a warrant is valid only if police officers have a reasonable and articulable

---

[11] The other indicator, predictions of future behavior, *see Navarette* at 398; *Manes,* 603 F.3d at 456, was not present here but does not detract from the other indicators which support my finding of the CI and CS being reliable.

suspicion that criminal activity may be afoot.") (Quoting *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010), in turn quoting *Navarrete-Barron*, 192 F.3d at 790).

Accordingly, because I find that the CI and the CS were reliable and because I find that law enforcement had a reasonable and articulable suspicion that criminal activity was afoot to conduct a valid investigatory *Terry* stop on Defendant, I recommend that the Court deny the motion to suppress on this issue.

### 2. *Consent to the Seizure of the Firearm*

Defendant and the Government again frame the consent issue differently. Defendant relies primarily on *United States v. Esquivias*, where the defendant voluntarily consented to a search of his person. 416 F.3d 696 (8th Cir. 2005). Defendant argues that the factors set forth in *Esquivias* do not support a finding that he voluntarily consented to have the firearm removed from the truck. (Doc. 32 at 1-2.) The Government mostly disregards Defendant's reliance on the law pertaining to consent to search, and instead argues that "Defendant received *Miranda* warnings before giving consent to law enforcement to seize the firearm, so his argument is essentially that his waiver of his *Miranda* rights was involuntary." [12] (Doc. 33 at 2.) While the act of giving consent (at least in this case) has a verbal dimension, the issue presented arises under the Fourth Amendment rather than the Fifth. In other words, the issue is not simply whether Defendant's consent, shown below, followed a valid waiver of *Miranda* rights:

> Inv. Leitzen: "Can we grab that gun out of there?"
> Defendant: "Yes. Please."

Rather, the issue presented is whether the consent was sufficiently voluntary to permit an unwarranted search and seizure.

---

[12] In fairness, despite the Government's framing of the issue, it does discuss cases where the issue presented is the voluntariness of consent for Fourth Amendment purposes.

Immediately before the alleged consent Inv. Leitzen had observed a red pickup truck associated with Defendant and his father parked in front of XXXX Bluff Street. Inv. Leitzen observed the passenger door of the truck open with Defendant sitting on the passenger seat and leaning back in the vehicle. Defendant was alone in the vehicle. Inv. Leitzen was standing near the corner of the porch of the Bluff Street residence and ordered Defendant out of the vehicle and over to him. Inv. Leitzen and other officers had their weapons drawn and Defendant was ordered out "at gunpoint." (Leitzen Hr'g Test. at 34.) Inv. Leitzen's body-worn camera footage shows Inv. Leitzen approach XXXX with his gun drawn and pointed at Defendant. (*Id.* at 2:16, Def. Ex. A.) In response to Inv. Leitzen's direction to exit the truck, Defendant emerged from the vehicle and asked, "For what?" Inv. Leitzen directed Defendant to put his hands on "the wall." Inv. Leitzen lowered his gun at 2:34 and no more handguns were visible thereafter. Another officer assisted placing Defendant in handcuffs as Defendant said, "I need you guys' help." (*Id.* at 2:38.) Inv. Leitzen asked Defendant if he had anything illegal on him and Defendant said, "No." Inv. Leitzen started a pat down search of Defendant's pants pockets and then asked if it is "alright we reach into your pockets." (*Id.* at 2:44.) The following exchange occurred:

> Defendant: "Dude, I need your guys' help. I have something in the car for you guys."
> Inv. Leitzen: "What do you got?"
> Defendant: "There's a fucking gun in there. I need help."
> Inv. Leitzen: "There's a gun in there?"
> Defendant: "Yup."

Inv. Leitzen advised Defendant of his *Miranda* rights at 3:07 and the video concluded,

> Inv. Leitzen: "What do you need help with?"
> Defendant: "They're framing me for something."
> Inv. Leitzen: "Where did the gun come from?"
> Defendant: "I don't know."
> Inv. Leitzen: "Is this your truck?"

29

Defendant: "No.  It's my father's truck."
Inv. Leitzen: "Can we grab that gun out of there?"
Defendant: "Yes.  Please."
Inv. Leitzen [to other officers]: "He says you can grab the gun out of there. He wants you to have it."

Under either Defendant's framing or the Government's framing, Defendant's consent to allow law enforcement to remove the gun from the truck was voluntary.  The factors[13] outlined in *Gastelum*, provide the following information relevant to determining whether Defendant's consent to remove the firearm from the truck was voluntary: (1) Defendant is 32 and reported severe brain injuries which Defendant's father confirmed and Defendant's father stated that doctors told him that Defendant "wouldn't be the same" after "surgery," *see* Doc. 18 at 3; (2) a text message from the CS to Inv. Grant suggested Defendant was high on drugs but Defendant does not appear to be intoxicated or under the influence of drugs based on Inv. Leitzen's body-camera footage, *compare* Doc. 27-2 at 4 *and* Def. Ex. A; (3) Defendant was informed of his *Miranda* rights; (4) Defendant has an extensive criminal history and presumably was aware of the protections provided by the legal system; (5) the length of detention was reasonable; (6) law enforcement did

---

[13] To wit:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.  It is also important to consider the environment in which an individual's consent is obtained, including [5]the length of the detention; [6] whether the police used threats, physical intimidation, or punishment to extract consent; [7] whether the police made promises or misrepresentations; [8] whether the individual was in custody or under arrest when consent was given; [9] whether the consent was given in public or in a secluded location; and [10] whether the individual stood by silently or objected to the search.

*Id.* (alteration in original, renumbered for clarity) (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)).

not use threats, physical intimidation, or punishment to extract consent; (7) law enforcement made no promises or misrepresentations; (8) Defendant was in custody when consent was given; (9) consent was given in public; and (10) Defendant did not object to the removal of the firearm from the truck, rather he appeared eager for law enforcement to relieve him of the gun.

Factors 3, 4, 5, 7, 9, and 10 weigh in favor of a voluntary consent. Factor 8 weighs against voluntary consent. As for factor 6, Defendant acknowledges that law enforcement did not use threats against him or punish him but argues that law enforcement used physical intimidation because "two police officers had their hands on the Defendant at the time he consented, that he was pushed up against a wall at the time he consented, and that he had been held at gunpoint only seconds before he consented." (Doc. 32 at 2.) The officers' approach to Defendant with guns drawn and request to have him place his hands on the wall before handcuffing him were not for purposes of intimidating Defendant to consent to removal of the firearm from the truck but were for officer safety as were not sure where the gun was located. *See United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) ("As part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop'") (quoting *Newell*, 596 F.3d at 879); *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) ("[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety."). Even though approaching Defendant in this manner was reasonably necessary given what officers knew about the circumstances, the approach and immediate arrest might have an intimidating effect. Here, however, if one takes Defendant's statements at face value (i.e., that he was looking for police help to relieve

him of the gun) any possible intimidation did not affect the consent. Thus, factor 6 is probably neutral or weighs slightly in favor of finding consent.

Factors 1 and 2 are neutral. Evidence of Defendant's brain injuries stem from Defendant's self-reporting of these injuries as noted in his pretrial services report and Defendant's father's confirmation of the injuries. The statements from Defendant and Defendant's father are vague and lack specificity. Defendant has provided no medical evidence to substantiate Defendant's self-reporting or provide any information regarding how Defendant's brain injuries would affect his ability to voluntarily consent to the removal of the firearm from the truck. Moreover, I am hesitant to rely on this self-reported information from the pretrial services report because "information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purposes of a bail determination and shall otherwise be confidential." 18 U.S.C. § 3153. Additionally, I note that on April 29, 2025, Defendant pleaded guilty to the single count in the Indictment. (Doc. 37.) Defendant and his attorney offered no reason to believe Defendant was not competent at the plea hearing and I found Defendant competent and his decision to plead guilty to be knowing and intelligent. (Doc. 38 at 2.)

As for factor 2, while the CS indicated via text message to Inv. Grant that Defendant was high on drugs, Inv. Leitzen's body camera footage does not confirm that Defendant was either intoxicated or under the influence of drugs at the time of his arrest. Based on the totality of the circumstances and considering the ten *Gastelum* factors, I find that Defendant voluntarily consented to the removal of the firearm from the truck.

The Government argues that because Defendant's consent to remove the gun from the truck came after he was given his *Miranda* warnings, Defendant must show that his *Miranda* waiver was involuntary. (Doc. 33.) Further, implicit in the Government's argument is that any statements Defendant made after he received his *Miranda* warnings

32

should also not be suppressed because Defendant voluntarily waived his *Miranda* rights. As set forth above, the totality of the circumstances does not demonstrate that Defendant's will was overborne. *See Pierson*, 73 F.4th at 590; *Syslo*, 303 F.3d at 866. Defendant's background, experience, and conduct during the *Terry* stop and subsequent consent to have the firearm removed from the truck do not support a finding that Defendant's waiver of *Miranda* rights was involuntary. *See Rose*, 124 F.4th at 1107; *Nguyen*, 608 F.3d at 374. Furthermore, there is no evidence of police coercion, threats, violence, psychological pressure, or promises sufficient to overbear Defendant's will. See *Pierson*, 73 F.4th at 590; *Rooney*, 63 F.4th at 1168; *Magallon*, 984 F.3d at 1284; *Williams*, 793 F.3d at 962; *see also United States v. Roberts*, 975 F.3d 709, 718 (8th Cir. 2020) ("Absent improper threats, use of physical force, or intimidation tactics, psychological pressure almost never renders a [statement] involuntary."). Additionally, as discussed above, the fact that law enforcement approached Defendant with guns drawn, had him stand against a wall, and then handcuffed him is not determinative of the voluntariness inquiry. *See United States v. Perez-Ruiz*, 322 Fed. App'x 475, 477 (8th Cir. 2009) ("While officers approached the truck with weapons drawn, removed Zamora's child from the area, and handcuffed Perez–Ruiz and Zamora, these actions do not preclude a finding of voluntariness"); *see also United States v. Comstock*, 531 F.3d 667, 677 (8th Cir. 2008) ("[B]eing handcuffed 'does not preclude a finding of voluntariness'") (quoting *United States v. Becker*, 333 F.3d 858, 861 (8th Cir.2003)); *United States v. Smith*, 973 F.3d 1374, 1376 (8th Cir. 1992) (finding that voluntary consent to search even though law enforcement entered premises with guns drawn).

Accordingly, I find that under both the Defendant's framing of the issue and the Government's framing of the issue that Defendant voluntarily consented to the removal of the firearm from the truck. Moreover, I find that Defendant voluntarily waived his *Miranda* rights as it relates to the removal of the gun from the truck and any statements

he made after receiving his *Miranda* warnings. Thus, I recommend that the Court deny the motion to suppress on this issue.

### 3. *Further Miranda Issues*

At the hearing, Defendant moved without objection to seek exclusion of statements made by Defendant immediately after he was seized by law enforcement. (Hr'g Tr. at 2.) Presumably, Defendant is referring to the following exchanges between Inv. Leitzen and Defendant set forth above and repeated below:

> In response to Inv. Leitzen's direction to exit the truck, Defendant emerged from the vehicle and asked, "For what?" Inv. Leitzen directed Defendant to put his hands on "the wall" which is the shoulder-high foundation of the porch approximately one foot off the sidewalk. Inv. Leitzen lowered his gun at 2:34 and no more handguns were visible thereafter. Another officer assisted placing Defendant in handcuffs as Defendant said, "I need you guys' help." (*Id.* at 2:38.) Inv. Leitzen asked Defendant if he had anything illegal on him and Defendant said, "No." Inv. Leitzen started a pat down search of Defendant's pants pockets and then asked if it is "alright we reach into your pockets." (*Id.* at 2:44.) The following exchange occurred:
>
> > Defendant: "Dude, I need your guys' help. I have something in the car for you guys."
> > Inv. Leitzen: "What do you got?"
> > Defendant: "There's a fucking gun in there. I need help."
> > Inv. Leitzen: "There's a gun in there?"
> > Defendant: "Yup."

"[A] *Terry* stop . . . allows an officer with reasonable suspicion to detain an individual in order to ask 'a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.'" *Rodriguez-Arreola*, 270 F.3d at 617 (quoting *Berkemer*, 468 U.S. at 439).

Here, in accordance with *Rodriguez-Arreola*, Defendant's *Miranda* rights were not infringed. During the *Terry* stop, while officers were investigating Defendant's illegal possession of a firearm, Inv. Leitzen asked Defendant if he had anything illegal

on his person and asked Defendant if he could reach in his pockets during the pat down search.  Further, unprompted, Defendant twice stated he needed law enforcement's help. He also stated that he had something in his car.  Inv. Leitzen response, "What do you got?" in the context of a *Terry* stop did not require a *Miranda* warning.  Similarly, Inv. Leitzen's follow-up question, "There's a gun in there did not require a *Miranda* warning. *See Pelayo-Ruelas*, 345 F.3d at 591-92; *see also United States v. Crisolis-Gonzalez*, 742 F.3d 830, 837 (8th Cir. 2014) ("*Miranda* does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers") (quoting *United States v. Hayes*, 120 F.3d 739, 744 (8th Cir.1997)); *United States v. Thurman*, No. 1:21-cr-00151-CLC-CHS, 2022 WL 18396271, at * (E.D. Tenn. Dec. 12, 2022), *Report and Recommendation adopted as modified on other grounds*, 2023 WL 315529 (E.D. Tenn. Jan. 19, 2023) (finding that officer's questions during a valid *Terry* stop regarding the contents of the defendant's pockets, whether the defendant shot a gun, why defendant shot a gun, the location of the gun, whether the defendant possessed ammunition, and twice confirmed the defendant was a convicted felon did not require the officer to read the defendant *Miranda* rights and the questions were directly related to the officer's reasonable suspicion that the defendant was a felon in possession of a firearm and/or ammunition).

Accordingly, based on the foregoing, I find that Inv. Leitzen's limited questioning immediately following the valid *Terry* stop did not require *Miranda* warnings prior to the time Defendant was, in fact, *Mirandized*.  Therefore, I recommend that the motion to suppress as to Defendant's statements before Defendant was *Mirandized* be denied.

### 4. *Inevitable Discovery*

Finally, the inevitable discovery doctrine is applicable here because, even if Defendant had not consented to the removal of the firearm from the truck, Inv. Soppe observed the firearm lying on top of clothing on the vehicle's passenger floorboard in

plain view. *See United States v. Hayes*, 75 F.4th 925, 928 (8th Cir. 2023) ("Officers may seize an effect without a warrant under the 'plain view doctrine' if they are lawfully present in a place to view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object") (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)); *United States v. Lloyd*, 396 F.3d 948, 954 (8th Cir. 2005) ("Objects in plain view of an officer properly in position to view the objects may be seized and admitted into evidence.") (Citing *Harris v. United States*, 390 U.S. 234, 236 (1968)). Moreover, Inv. Soppe testified that because of the placement of the handgun and the fact it was not covered, it would have been in plain view. If Defendant had not been ordered from the vehicle, it would have inevitably been observed by law enforcement. Thus, even if the Court finds Defendant was unlawfully seized when he was ordered out of his vehicle, the gun would have been visible to law enforcement who would then have reasonable suspicion to seize Defendant and the firearm.

Additionally, a K-9 alerted to the presence of drugs in the vehicle which provided law enforcement with probable cause to search the truck. Defendant does not argue that the K-9 sniff was invalid or that the K-9 was unreliable. *See United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007) ("A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable") (quoting *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir.1999)); *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) ("Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present."). Accordingly, I find that even if Defendant had not consented to the removal of the gun from the truck, law enforcement would have inevitably found the gun based on Inv. Soppe's plain view

Case 2:25-cr-01001-CJW-MAR    Document 41    Filed 05/12/25    Page 36 of 37

observation and/or during the search following the K-9's positive alert. Therefore, I recommend that the Court deny the motion to suppress.

## IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 23.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 12th day of May, 2025.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa