# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 25-CR-1001-CJW-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| NICHOLAS DAVID WELTER, | |
| Defendant. | |

## I.     INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R"), (Doc. 41), by the Honorable Mark A. Roberts, United States Magistrate Judge, recommending the Court deny defendant's motion to suppress (Doc. 23).

On January 15, 2025, a grand jury returned an Indictment charging defendant with one count of Possession of a Firearm by a Felon in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8). (Doc. 3). On April 29, 2025, defendant appeared before Judge Roberts and entered a conditional plea of guilty to count one of the Indictment. (Docs. 37 & 38). On May 14, 2025, the Court accepted defendant's conditional guilty plea. (Doc. 42). Defendant's guilty plea is conditioned on the Court's ruling on his motion to suppress—if granted, defendant may withdraw his plea. *See* (Doc. 39-1, at 1).

Defendant's motion to suppress, filed February 24, 2025, seeks to suppress a Glock 20 10mm handgun which police officers seized from defendant's vehicle on October 18, 2024, in Dubuque, Iowa. (Doc. 23-1). Defendant also moved at the suppression hearing, without objection, to suppress the statements he made to police officers immediately after they seized him. (Doc. 29, at 1); (Doc. 44, at 4-5). The

government filed a resistance to defendant's motion to suppress. (Doc. 27). On March 25, 2025, Judge Roberts held a hearing on the motion. (Doc. 29). After the hearing, defendant filed a supplemental brief along with a supplemental exhibit, (Doc. 32), to which the government filed a supplemental response (Doc. 33). On May 12, 2025, Judge Roberts issued his R&R, which recommends the Court deny defendant's motion. (Doc. 41). On May 27, 2025, defendant timely filed his objections to the R&R. (Doc. 45). For the following reasons, defendant's objections, (Doc. 45), are **sustained-in-part and overruled-in-part**, the R&R, (Doc. 41), is **adopted** to the extent it is consistent with this order and ultimately recommends denial of defendant's motion, and defendant's motion to suppress, (Doc. 23), is **denied**.

## II. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendation to which objection is made." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[ ] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report and recommendation when such review is required. *Lothridge*, 324 F.3d

at 600. Accordingly, the Court reviews the disputed portions of Judge Roberts' R&R novo.

Any portions of a report and recommendation to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (alteration in original) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A district judge may, however, elect to review a report and recommendation under a more exacting standard even if no objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 154 (1985).

### III. DISCUSSION

Defendant lodges a variety of objections to Judge Roberts' findings. The Court will take them up in turn.

#### A. *Confidential Informant's Tip Regarding Defendant Near Firearm*

Defendant first objects to Judge Roberts' finding that the confidential informant ("CI") who spoke to Inv. Leitzen on October 7, 2024, had "eyewitness knowledge of Defendant possessing a handgun." (Doc. 45, at 1-2); (Doc. 41, at 26). Defendant contends that the CI's conversation with Inv. Leitzen does not support the conclusion that the CI saw defendant in "possession" of a firearm, whether it be actual or constructive possession. (Doc. 45, at 1-2). Defendant also lodges a related objection to Judge Roberts' finding that the CI "provided detailed descriptions observing Defendant with the handgun at Mr. Chop's house." (Doc. 45, at 2); (Doc. 41, at 27). Specifically, defendant contends that the CI's tip should not be described as "detailed." (Doc. 45, at 2).

3

"A person may have either actual or constructive possession [of a thing]." *United States v. Ali*, 63 F.3d 710, 715 (8th Cir. 1995). "A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of that thing." *Id*. "A person who . . . has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of the thing." *Id*. "Proximity to a thing is not necessarily possession of the thing, but is a circumstance which may be considered in determining whether a person has possession of a thing." *Id*. at 716.

Upon review of Inv. Leitzen's testimony at the suppression hearing, the Court finds it uncertain whether, based on the evidence, the conclusion can be drawn—insofar as it is a factual or legal conclusion (under an unspecified evidentiary standard)—that defendant was in actual or constructive possession of a firearm at Joe Chop's house sometime before October 7, 2024. As the Court will explain, however, such a determination about whether the facts of "possession" are established does not alter the disposition of defendant's motion to suppress.

Inv. Leitzen testified that on the morning of October 7, 2024, the CI informed Inv. Leitzen that he recently[1] observed defendant at the residence of "Joe Chop"—a known drug dealer—"with a handgun," which the CI believed to be a black 9mm handgun. (Doc. 44, at 7). The CI told Inv. Leitzen that he knew defendant was a felon and was therefore prohibited from possessing firearms. (*Id.*). Inv. Leitzen testified that the CI told him that defendant "had a gun" at Joe Chop's house and, more specifically, the CI observed the firearm sitting on a table—but Inv. Leitzen did not ask the CI whether the CI actually saw defendant place the firearm on the table. (*Id.*, at 17, 30–32).

---

[1] Inv. Leitzen testified that he believed the CI's statement on the morning of October 7th that he had seen defendant and the firearm at Joe Chop's house "recently" meant that the CI had observed this "probably the night before," but Inv. Leitzen was not sure. (Doc. 44, at 31).

The Court finds that, at the very least, the CI observed defendant at Joe Chop's residence where a handgun was on a table, and that the CI apparently believed from the circumstances that it was defendant's firearm. For some reason, the CI attributed the gun to defendant, but did not explain why or how he reached that conclusion. Inv. Leitzen apparently did not ask follow up questions of the CI about what made the CI believe the gun belonged to defendant, as opposed to others, or the attorneys failed to probe more into what the CI told Inv. Leitzen about why the CI believed it was defendant's gun, even though he did not see defendant place the gun on the table. Perhaps it was the proximity to defendant, for example. Perhaps the firearm was immediately in front of defendant as he sat at the table, next to something else that belonged to defendant, and no one else was around. Inv. Leitzen just testified that the CI told him that defendant "had" a firearm, and was "with" a firearm. To the extent one's "possession" of a thing is a legal conclusion, without more detailed information the Court cannot definitively conclude that defendant possessed a firearm based on Inv. Leitzen's hearsay testimony about his conversation with the CI. In short, the elicited information is simply too vague and imprecise for the Court to conclude factually or legally that defendant possessed a firearm on this occasion at this location. Thus, the Court sustains defendant's objection to Judge Roberts' finding the CI had "eyewitness knowledge of Defendant possessing a handgun" to the extent that finding represents a factual or legal conclusion about possession. This determination, however, has little relevance to the ultimate question here; that is, whether officers had reasonable suspicion that criminal activity may have been afoot sufficient to later conduct an investigatory *Terry* stop on defendant on October 18, 2024.

As for the relevance of the CI's tip to the question of reasonable suspicion, the Court finds the CI did indeed contribute reliable information to police—which was later corroborated by the information police independently learned from the confidential source

("CS")—about defendant possibly possessing a firearm while prohibited. Inv. Leitzen explained that he had worked with this CI, whose identity was known to him, for several years, and that the CI had provided tips that had "always panned out and turned out to be true information." (Doc. 44, at 7-8). The CI's information had served as the basis for five or six search warrants, the CI had conducted multiple undercover buys, and the CI's information had been corroborated on several occasions. (*Id.* at 8). *See United States v. Nolen*, 536 F.3d 834, 840 ("Reliable informants are individuals who have a 'track record of supplying reliable information' to law enforcement officers." (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993))). Here, the CI did not simply and abstractly report that defendant was, for instance "near a gun." Rather, the CI informed Inv. Leitzen that he knew defendant by name; that he saw defendant firsthand at Joe Chop's house in close proximity, at the very least, to a firearm on the table; that he believed the firearm was, specifically, a black 9mm handgun; and that he knew defendant to be prohibited from possessing that firearm due to his felon status. Based on these specific details, the Court overrules defendant's objection to Judge Roberts' characterization of this tip as "detailed."

Although the Court finds the information provided to Inv. Leitzen by the CI constituted a detailed tip from a reliable informant, the Court need not determine whether the CI's tip, standing alone, would have given police officers reasonable suspicion sufficient to conduct an investigatory *Terry* stop on defendant. *But cf. id.* ("Information supplied by [known, reliable informants] may be 'sufficiently reliable to support a probable cause finding.'" (quoting *Williams*, 10 F.3d at 593)); *Alabama v. White*, 496 U.S. 325, 330 (1990) ("[R]easonable suspicion can arise from information that is less reliable than that required to show probable cause."); *United States v. Martin*, 15 F.4th 878, 882 (8th Cir. 2021) ("Reasonable suspicion must be supported by more than a mere hunch, but the likelihood of criminal activity need not rise to the level required for

6

probable cause, and it falls considerably short of satisfying the preponderance of the evidence standard." (internal quotation marks omitted)). When the CI's tip is taken together with the additional information later provided to police by the CS, in view of the totality of the circumstances, the Court concludes police officers had reasonable suspicion sufficient to warrant an investigatory *Terry* stop on defendant.

### B. Reliability and Corroboration of Confidential Source's Tips

Defendant objects to Judge Roberts' findings that the information the CS provided to Inv. Grant was reliable and corroborated by independent police observation. (Doc. 45, at 2-5). Defendant argues that, contrary to Judge Roberts' findings, "simply verifying [defendant's] physical location, his father's identity, and his vehicle do not constitute sufficient 'corroboration'" of the CS's information, "especially in light of the information's contradiction by police surveillance." (*Id.*, at 4).

Inv. Grant testified that he had personally known this CS for at least forty years. (Doc. 44, at 43). Inv. Grant testified that he had previously communicated with the CS about family members, and the CS would also inquire about missing items to avoid buying stolen property. (*Id.*, at 44). On the evening of October 16, 2024, the CS sent Inv. Grant a text message inquiring whether he, the CS, would be charged with a crime if he took a gun from another person who "needed it taken" and then called law enforcement about it. (Doc. 27-2, at 1). The CS also indicated that the person in possession of the firearm in question wanted to be pulled over by police, while having the firearm displayed, to attempt "suicide by cop[.]" (*Id.*). Inv. Grant testified that less than an hour later, the CS called him. (Doc. 44, at 46). The CS was whispering, and Inv. Grant testified he "took that to mean that [the CS] was with or near someone" whom the CS didn't want to eavesdrop on the conversation between the CS and Inv. Grant. (*Id.*, at 46, 67). Inv. Grant testified that the CS told him over the phone that the individual to whom he was referring in the text messages was pointing a handgun at himself and

someone else. (*Id.*, at 46). The CS also told Inv. Grant that he was in or near Joe Chop's house, that the individual in question was in a red GMC truck with the gun, and that the individual was "tweaking." (*Id.*, at 46–47). Later that night, the CS texted Inv. Grant a license plate number, which police dispatch verified as registered to a red Chevy Colorado truck belonging to Kurt Welter, defendant's father. (*Id.*, at 47).

Inv. Grant testified that the next morning, on October 17, 2024, he attempted to locate the vehicle on City of Dubuque traffic cameras. (*Id.*). Inv. Grant explained that he learned the location of Joe Chop's residence from other investigators. (*Id.*, at 48). While Inv. Grant was investigating traffic cameras, the CS called him again, this time reporting that defendant was the individual in question from the previous night who was in the vehicle with a handgun, and that he was pointing it at his father, Kurt Welter. (*Id.*, at 48). The CS also reported that defendant was a methamphetamine user, was paranoid, and was worried about returning to prison. (*Id.*, at 49). The CS also described the truck in question as being heaped with junk because defendant and his father were living in it. (*Id.*). Inv. Grant testified that with the help of this additional detail, he located the truck via traffic camera footage and observed it near Joe Chop's residence around 10:00 PM on the previous night, October 16, 2024.[2] (*Id.*). Inv. Grant explained that by using file photographs of defendant and his father, he was able to identify them in the truck on the traffic camera footage. (*Id.*, at 50).

Inv. Grant testified that the next day, at approximately 3:07 PM on October 18, 2024, he received another call from the CS. (*Id.*, at 52). The CS informed Inv. Grant

---

[2] More specifically, Inv. Grant testified that he located the truck at the intersection of 22nd Street and Central Avenue in Dubuque, Iowa. This location is roughly one-half mile away from Joe Chop's house. *See* (Docs. 44, at 49–52; 27-3, at 3). Inv. Grant then testified that in addition to observing the vehicle at this intersection, he also saw the vehicle "right around" Joe Chop's house, and even though he lost sight of the truck for a period of time, he knew "by tracking it" with the traffic cameras that it had "gone into that area of Joe Chop's house." (Doc. 44, at 51).

that defendant's vehicle was near Behr Funeral Home—which is approximately two or three blocks from Joe Chop's Bluff Street residence—and that defendant was "still in possession of the gun and was not in his right frame of mind" and was acting paranoid. (*Id.*). Inv. Grant clarified that the CS did not tell Inv. Grant why he believed defendant still had a gun. (*Id.*, at 74). After the phone call with the CS, Inv. Grant attempted to locate the truck on traffic cameras, and the CS texted Inv. Grant that the vehicle was still in the area. (*Id.*, at 52). Unable to immediately identify the truck on traffic cameras, Inv. Grant drove to the area near Behr Funeral Home. (*Id.*, at 53). Inv. Grant then saw defendant standing by the truck on Bluff Street. (*Id.*). Inv. Grant did not observe any bulges on his person consistent with possession of a firearm, nor did he observe defendant "tweaking," acting paranoid, making furtive movements, or otherwise appearing suspicious. (*Id.*, at 74–75). Inv. Grant was in communication with Inv. Leitzen by this time as they attempted to confirm defendant's felon status. (*Id.*, at 54). Inv. Grant testified that law enforcement confirmed defendant's felon status before he was ultimately detained. (*Id.*, at 80).

Inv. Grant testified that at 3:52 PM on October 18, 2024, he received another text message from the CS advising him that defendant was still in the truck and explaining that defendant was "not welcome in apartment" because he points "that" at everyone. (*Id.*, at 54–55); (Doc. 27-2, at 3–4). Inv. Grant interpreted "that" to mean the gun. (Doc. 44, at 55). Inv. Grant did not know whether the CS's information was based on firsthand observation or rather something the CS learned remotely through others. (*Id.*, at 56–57). At 4:09 PM, the CS texted Inv. Grant that defendant was "a hundred percent spun," which Inv. Grant interpreted to mean defendant was not "in his right mind and possibly on drugs." (*Id.*, at 55). Once Inv. Grant had spotted defendant, he took up a position near Joe Chop's house to monitor the situation. (*Id.*).

At about 4:30 PM that same day, Inv. Leitzen and other officers who had been surveilling defendant executed their plan to approach defendant's location on Bluff Street and detain him during their investigation. (*Id.*, at 14). By this time, Inv. Leitzen had learned about the information gathered by Inv. Grant. (*Id.*, at 38). Specifically, Inv. Leitzen testified as follows:

> Investigator Bill Grant with the Dubuque County Sheriff's Office contacted me on October 18th, just probably an hour before we ended up making contact with [defendant], and he provided me information that he had received from one of his sources, that [defendant] was in possession of a handgun and had been waving it around and a couple days prior had pointed the gun at his father's head. And the informant advised he believed [defendant] was going to shoot somebody.
>
> So we—we located [defendant] in front of [XXXX] Bluff Street sitting in the vehicle, and we knew that his father was inside of or lived at [XXXX] Bluff Street. So learning the information from Investigator Grant that [defendant] was in possession of a firearm right then, had pointed the gun at his dad's head a couple days prior, and the informant believed that [defendant] was going to shoot somebody imminently, we believed [defendant] was possibly sitting in his truck waiting for dad to come out of the house or he was going to eventually go into the house. So we decided we had to make contact with [defendant] to stop him from doing what he was going to do and investigate to see whether or not he had that gun.

(*Id.*, at 38–39).

Inv. Leitzen testified that he observed the red pickup truck associated with defendant and his father parked in front of Joe Chop's residence on Bluff Street. (*Id.*, at 10). Inv. Leitzen observed the passenger door of the truck open and saw defendant sitting on the passenger seat, leaning back with one or both legs out of the vehicle. (*Id.*). Inv. Leitzen was standing near the corner of the porch of Joe Chop's house and ordered defendant out of the vehicle and over to him. (*Id.*, at 12–13). Inv. Leitzen testified that defendant complied with the order, approached Inv. Leitzen, and as he was being detained and placed in handcuffs, defendant immediately volunteered that there was a gun in the

car and told the officers they could have it. (*Id.*, at 14–15). Inv. Leitzen's body-worn camera substantiates this testimony. *See* (Doc. 41, at 10–11).

Defendant's objection concerns the nature of the information the CS provided to Inv. Grant and the extent to which officers corroborated those tips. Defendant argues that police minimally verified some of the descriptive information relayed by the CS— namely, defendant's location, his father's identity, and the truck. (Doc. 45, at 3). Defendant states—and the Court agrees—that "[t]he dangers of relying on corroborated information which only identifies an individual are well noted." (*Id.*, at 4); *see, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 272 (2000) ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Defendant's objection also asserts that the CS's information was "contradicted" by police surveillance because police did not observe any conduct consistent with the CS's descriptions that defendant was "a hundred percent spun," was acting paranoid, and was predisposed to point a gun "at everyone." (Doc. 45, at 4).

Defendant's objections fail to place the CS's tips in the full context of what officers knew at the time they conducted the *Terry* stop on defendant, all of which is relevant to whether reasonable suspicion arose sufficient to justify such a stop. Defendant relies on *Florida v. J.L.*, where the Supreme Court determined no reasonable suspicion arose from a bare-bones anonymous tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun. 529 U.S. at 268. Here, however—for starters—this case is distinguishable because the information known to officers at the time of the stop was based primarily on a series of tips provided by two independent and known informants, the first of whom had a proven track record of reliability.

In the Court's view, the facts here are more comparable to *Adams v. Williams*, 407 U.S. 143 (1972). In *Adams*, someone known to the police officer approached the officer and informed him that an induvial seated in a nearby vehicle was carrying

11

narcotics and had a gun at his waist. 407 U.S. at 144–45. The officer approached the vehicle and asked the occupant to open the door. *Id.* at 145. When the occupant instead rolled down the window, the officer reached into the car and removed a revolver from the occupant's waistband, even though it had not been visible to the officer from outside the vehicle. *Id.* at 145. The Supreme Court rejected the occupant's argument that "absent a more reliable informant, or some corroboration of the tip, the policeman's actions were unreasonable under the standards set forth in *Terry v. Ohio*" and instead found that the officer's limited intrusion to seize the gun was permissible under *Terry*. *Id.*, at 145–47. The Supreme Court explained that "[t]he informant was known to [the officer] personally and had provided him with information in the past,[3]" and "[t]he informant . . . came forward personally to give [the officer] information that was immediately verifiable at the scene." *Id.*, at 146. The Supreme Court remarked that such investigatory intrusions may constitute an appropriate police response in situations "when a credible informant warns of a specific impending crime." *Id.* at 147.

Here, the CI—a reliable, known informant with a proven track record of providing accurate, incriminating information—told Inv. Leitzen on October 7, 2024, that he recently saw defendant firsthand with a black 9mm handgun and that he knew defendant was a felon and was therefore prohibited from possessing firearms. By the time Inv. Leitzen stopped defendant on October 18, 2024, Inv. Leitzen also knew that the CS—an informant also personally known police officers—had independently relayed multiple tips to Inv. Grant that defendant had a gun and was posing a safety threat. The CS also provided information that was immediately verifiable at the scene on the day of the arrest as to defendant's location in the red truck in front of Joe Chop's house, also reporting

---

[3] Notably, the informant had previously provided information to police only once, which was never substantiated and did not lead to an arrest. 407 U.S. at 156–57 (Marshall, J., dissenting).

that defendant was in the truck because he was "not welcome in apartment" for pointing "that" at everyone, which police reasonably believed meant a firearm.[4] Not only did Inv. Leitzen know that a different, reliable informant—the CI—had recently reported seeing defendant firsthand with a handgun at the exact same location; Inv. Leitzen also knew that defendant and his father were previously involved in burglaries around Dubuque involving stolen firearms. (Doc. 44, at 9–10). Police had also confirmed defendant's felon status by the time they engaged him.

Altogether, the Court finds police had reasonable suspicion that criminal activity may be afoot sufficient to conduct an investigatory *Terry* stop on defendant. To the extent

---

[4] Defendant further objects to Judge Roberts' finding that the CS contemporaneously reported events to Inv. Grant on October 16, 2024, and was therefore to be found more reliable, based on the fact that the CS was whispering on the phone. (Doc. 45, at 4–5). Defendant argues, "[I]f whispering alone gives informants greater reliability in the eyes of the law, why should any informant *not* whisper when reporting a tip? To infer further reliability just from a whisper is too far a stretch, and [defendant] asks the Court to not adopt this finding." (*Id.*, at 5). The Court disagrees with defendant; the fact the CS whispered is a factor that contributes to reliability. True, whispering could be faked to suggest reliability, but that invites speculation and conjecture. Officers, and courts, are permitted to rely on the reasonable assumption that a CS would not whisper just to falsely enhance the appearance of reliability. Regardless, this would not alter the Court's conclusion that the stop remained justified by reasonable suspicion under the totality of the circumstances.

defendant objects to such a conclusion, it is overruled, and defendant's motion to suppress on that basis is denied.[5]

## IV. CONCLUSION

For these reasons, defendant's objections, (Doc. 45), are **sustained-in-part and overruled-in-part**, the R&R, (Doc. 41), is **adopted** to the extent it is consistent with this order, and defendant's motion to suppress, (Doc. 23), is **denied**.

**IT IS SO ORDERED** this 18th day of July, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

---

[5] Defendant does not object to Judge Roberts' conclusions that defendant voluntarily consented to the removal of the firearm from the truck, that defendant voluntarily waived his *Miranda* rights as it relates to the removal of the firearm from the truck and to any statements he made after receiving his *Miranda* warnings, and that Inv. Leitzen's limited questioning immediately following the valid *Terry* stop did not require *Miranda* warnings prior to the time defendant was *Mirandized*. (Doc. 41, at 33–37). Defendant also does not object to Judge Roberts' conclusions that even if defendant was unlawfully seized when he was ordered out of the vehicle and/or he did not voluntarily consent to the removal of the firearm, the firearm nevertheless would have been inevitably discovered in plain view by police officers or inevitably discovered in a search of the vehicle following the K-9's sniff and positive alert to the presence of drugs in the vehicle. (*Id.*, at 36–37). The Court has reviewed these findings and conclusions, and they are not clearly erroneous. The Court thus adopts Judge Roberts' alternative bases on which to deny defendant's motion to suppress.